***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms and adopts the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On 5 February 2000, the date of the alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer on 5 February 2000.
3. Defendant-employer, was at all relevant times, insured for claims under the North Carolina Workers' Compensation Act with The Hartford.
4. Plaintiff's average weekly wage will be determined from a Form 22 prepared by defendant-employer.
5. The parties agree that the following documents may be received into evidence without further authentication or proof. This stipulation does not preclude further examination of the persons identified in connection with each record or the addition of further medical documentation as it is received:
a. Plaintiff's employment records;
 b. Lincoln Medical Center records (Alex Sanchez, M.D.; Donovan Thompson, M.D.);
 c. Optima Therapies records (Bill Helms, PT; Rebecca Reep, LPTA);
 d. Well Bridge Orthopedics records (Karen M. Rives, M.D.);
 e. Carolina Orthopedic Sports Medicine Center records (William H. Jarman, Jr., M.D.; Damien A. Doute, M.D.);
 f. Charlotte Pain Associates records (Henry Okonneh, M.D.);
g. All other relevant medical notes.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 35 years old, born 1 February 1966. Plaintiff is 5 feet, 3 inches tall and weighs 250 pounds. Plaintiff graduated high school, but has not pursued any further education.
2. Prior to her alleged injury, plaintiff had worked for defendant-employer as a spinning operator for approximately 12 years. Plaintiff's previous work experience includes working as a convenience store clerk, a waitress, a cook, a cashier, and a garment inspector.
3. Plaintiff suffered a lumbar strain in 1994, which was treated by two visits to a doctor but without medication or physical therapy. Between 1994 and 2000, plaintiff experienced intermittent pain and discomfort in her back.
4. Plaintiff claims that she injured her back while performing her job duties as a spinner on 5 February 2000. Plaintiff claims that she was doffing her machines and when she stood up her back began hurting.
5. Plaintiff's supervisor, Julie Parillo, testified that plaintiff complained of her back hurting at approximately 9:00 a.m. on 5 February before plaintiff began doffing her machines. Plaintiff told Ms. Parillo that her back had been hurting, and that if it didn't feel better, she was going to have to leave work. Ms. Parillo testified that she did not fill out an accident report on 5 February because no accident was brought to her attention. Plaintiff did not indicate to Ms. Parillo that her back pain was in any way caused by or related to her job. Plaintiff did return to Ms. Parillo later in the day and told Ms. Parillo that her back hurt "worse" after doffing her machines and that she wanted to go home. Plaintiff left work shortly before 3:00 p.m. that afternoon. On Monday, 7 February 2000, Ms. Parillo completed a report documenting plaintiff's complaints, and plaintiff signed the report.
6. Based upon the Deputy Commissioner's observation of the witnesses and their demeanor, as well as Ms. Parillo's contemporaneous documentation of plaintiff's complaints, the Full Commission finds Ms. Parillo's testimony to be more credible than plaintiff's regarding the events of 5 February 2000. Plaintiff's back was hurting when she began work on 5 February prior to doffing her machines.
7. On Monday, 7 February 2000, plaintiff went to work and spoke with shift supervisor Charles Eslinger. Plaintiff informed Mr. Eslinger that she wanted to see a doctor. Mr. Eslinger told plaintiff that she should go to Dr. Alex Sanchez at Lincoln Medical Center on Tuesday, 8 February 2000.
8. Plaintiff first saw Dr. Sanchez on 8 February 2000. Dr. Sanchez examined plaintiff and ordered x-rays before diagnosing her with acute lumbosacral strain. Dr. Sanchez clinically determined that the source of plaintiff's back pain was in the lumbar spine muscles rather than any kind of disc problem. Dr. Sanchez did not observe any symptoms radiating into the leg or any signs of nerve root compression. Dr. Sanchez noted that plaintiff did not have any loss of sensation or motor function in her lower extremities. Dr. Sanchez prescribed an anti-inflammatory medicine, a muscle relaxant, and physical therapy. Dr. Sanchez also authorized plaintiff to do modified duty work, with no bending, stooping, or heavy lifting.
9. On 9 February 2000, plaintiff returned to work with defendant-employer. She performed modified duty work, according to Dr. Sanchez's instruction, from 9 February until 23 February 2000. This work entailed keeping her spinning machines running, but not "doffing" them.
10. Dr. Sanchez saw plaintiff again on 16 February 2000, and determined that her acute lumbosacral strain was resolving. Dr. Sanchez discontinued plaintiff's use of the anti-inflammatory medicine and increased her permitted level of work activity.
11. Plaintiff returned to Dr. Sanchez on 23 February 2000, and informed Dr. Sanchez that her pain was almost completely resolved. Dr. Sanchez observed that plaintiff had improved substantially from her condition on 8 February, and it was his opinion that plaintiff had reached maximum medical improvement. From plaintiff's first visit on 8 February 2000 through the 23 February 2000 examination, Dr. Sanchez continued to find no evidence of any nerve root compression, neurological problems, or disc problems.
12. Dr. Sanchez released plaintiff to return to her regular work, with no restrictions on 23 February 2000. From 23 February 2000 until 4 March 2000, plaintiff worked full shifts, standing for extended periods in the course of her job, and without complaining of further back pain.
13. On the evening of Friday, 3 March 2000, plaintiff was at home when her teenage stepdaughter ran into her and knocked plaintiff to the floor, injuring her back. Shortly after plaintiff began work the following day, 4 March, she told supervisor Eslinger, through tears, that her stepdaughter had jumped on her and knocked her down the night before and that her back hurt. Mr. Eslinger told plaintiff that if she couldn't work, she needed to leave and "hopefully see a doctor."
14. Plaintiff went to the emergency department of Lincoln Medical Center on 4 March 2000, and was examined by Dr. Donovan Thompson at 10:15 a.m. Plaintiff told both the triage nurse and Dr. Thompson that her visit to the hospital was prompted by being knocked down by her stepdaughter. Plaintiff complained of lower back pain going down her leg on her left side and stated that the pain began the night before.
15. Dr. Thompson ordered x-rays, which revealed a degenerative narrowing of the L5-S1 disk space as well as the genetic disorder of spina bifida. Dr. Thompson diagnosed acute lumbar strain with no evidence of neurological problems or an acute herniated disc. Dr. Thompson prescribed a pain medication and a muscle relaxant and instructed plaintiff to return to work on Monday, 6 March 2000, with no restrictions. Because Dr. Thompson knew plaintiff's back problem was not a work-related injury, he referred her to an orthopedic surgeon, Dr. Karen Rives, for standard follow-up rather than to Dr. Sanchez.
16. Dr. Thompson was of the opinion and the Full Commission finds, that plaintiff's symptoms and condition on 4 March 2000 were most likely caused by her being knocked down the night before.
17. Plaintiff called Mr. Eslinger on the telephone Monday, 6 March 2000, and informed him that she would not be able to work due to medication, and that she also needed the time off to try to get her daughter some help.
18. On 9 March 2000, plaintiff sought treatment from Dr. Karen Rives, an orthopedic surgeon. Plaintiff complained of low back pain, and she told the doctor both of the pain she experienced at work on 5 February 2000 and being pushed down by her daughter on 3 March 2000. Plaintiff reported to Dr. Rives that her back pain increased since she fell on 3 March.
19. Dr. Rives found that plaintiff was not experiencing any pain in the lumbosacral spine area and that her range of motion was normal. Dr. Rives also found no evidence or signs of nerve root compression, disc problems, or neurological problems. Dr. Rives' diagnosis was back pain and some SI joint problem. She recommended that plaintiff undergo physical therapy, return to sedentary work, and undergo an MRI for further analysis of her complaints. Dr. Rives ordered an MRI to gain objective evidence of plaintiff's condition.
20. Plaintiff demonstrated to Dr. Rives that she was hypersensitive and complained of pain that was out of proportion with the objective findings.
21. Dr. Rives was of the opinion that the incident of 3 March 2000 resulted in an exacerbation and worsening of plaintiff's condition, and that the direct blow that plaintiff received when she was knocked to the floor on 3 March 2000 was the cause of her muscle spasms.
22. On 9 March 2000, plaintiff presented Mr. Eslinger with a doctor's note stating that she could only perform light duty work, which would not include doffing the spinning machines. Mr. Eslinger then informed plaintiff that since she could not perform her job as a spinner due to the medical restrictions that were necessitated by a personal incident rather than a work-related injury, defendant-employer did not have work available for her.
23. Defendant-employer placed plaintiff on a personal leave of absence on 10 March 2000, and paid her short-term disability benefits in the amount of $135.00 per week for 26 weeks, pursuant to a disability plan totally funded by the employer.
24. Plaintiff returned to Dr. Rives on 21 March 2000 with the same complaints of back pain. She had not had an MRI performed, and she had neither gone to physical therapy nor performed her home exercises. Plaintiff's range of motion was normal and there was no sign of numbness in her lower extremities. Again on 21 March 2000, there was no indication of plaintiff having a neurological problem or nerve root compression. Dr. Rives again instructed plaintiff that she could do sedentary work. Plaintiff was scheduled to return to Dr. Rives on 20 April 2000, but she did not appear for her appointment.
25. On 7 April 2000, plaintiff returned to Dr. Sanchez, complaining of back pain. Plaintiff told Dr. Sanchez that more than a month before, during the first week in March, her left leg began hurting, and on 4 March she experienced numbness in her leg and stumbled or fell. Dr. Sanchez noted that plaintiff's complaints on 7 April were different than those presented in February following her claimed injury at work. Plaintiff never complained of pain and numbness in her leg, nor had she complained of her leg giving way or indicated that she needed a cane to walk following the 5 February incident at work.
26. Despite Dr. Sanchez asking plaintiff directly whether she had had any injuries since 23 February 2000, including incidents involving any family members, Plaintiff denied any such incident or injury, failing to inform Dr. Sanchez of being knocked to the ground by her stepdaughter on 3 March.
27. Dr. Sanchez's examination of plaintiff on 7 April 2000, revealed signs of nerve impingement. He noted that her condition had changed dramatically from what he had observed in his February examinations of her when he had conducted the same tests and discerned no such nerve impingement. On 7 April 2000, Dr. Sanchez diagnosed plaintiff with acute back pain, and he felt it necessary to determine whether she had disk herniation in L5-S1 area. Prior to 7 April, Dr. Sanchez had not observed any signs or symptoms or findings consistent with a herniated disk or any type of neurologic compromise.
28. Dr. Sanchez testified, and the Full Commission finds as fact, that the condition for which he treated plaintiff on 7 April 2000 could indeed have been caused by her being knocked down on 3 March, and the traumatic incident at home on 3 March was more likely to have caused plaintiff's condition than any bending at work in February. Dr. Sanchez further testified, and the Full Commission finds as fact, that plaintiff's subsequent low back symptoms were not related to plaintiff's alleged 5 February 2000 injury at work.
29. On 6 June 2000, plaintiff saw Dr. William Henry Jarman, Jr., an orthopedic surgeon, complaining of low back pain into her left buttock area. Plaintiff did not inform Dr. Jarman of being knocked down by her stepdaughter on 3 March. Dr. Jarman examined her and reviewed x-rays, diagnosing plaintiff with degenerative joint and disc disease of the lumbar spine, lumbar strain, and obesity. He did not find any evidence of a neurologic problem or nerve root compression. Dr. Jarman prescribed physical therapy, an anti-inflammatory medication, a muscle relaxant, and no work for three weeks.
30. Dr. Jarman could not find any anatomic explanation for plaintiff's subjective complaints regarding pain in her back, nor could he find any basis for her subjective complaint of her legs giving way. Dr. Jarman attributed some of plaintiff's inhibited movement to being extremely overweight, and he found it necessary to speak to plaintiff concerning her motivation. He also noted that plaintiff magnified her symptoms and that she did not put forth full effort in demonstrating her physical capabilities when he examined her.
31. Plaintiff returned to Dr. Jarman on 27 June and 18 July 2000, complaining on the latter date of left leg pain in addition to back pain. There was no evidence of nerve root compression or a neurologic problem on either of these dates. On 18 July, Dr. Jarman determined that because plaintiff was making no progress in physical therapy, there was no need for her to continue therapy. Again, Dr. Jarman was concerned that plaintiff was exaggerating her symptoms. Dr. Jarman could find no physical reason to keep plaintiff from working and released her to return to work with a lifting and pushing restriction of no more than 20 pounds.
32. Plaintiff saw Dr. Jarman again on 25 August 2000, complaining of pain in her lower back as well as a new complaint of pain in her entire rib area. Dr. Jarman could find no reason for this pain. Additionally, Dr. Jarman observed that plaintiff had an exaggerated pain gait and engaged in heavy breathing. He concluded that plaintiff continued to engage in symptom magnification, and he referred her to the Pain Clinic.
33. Dr. Jarman's last visit with plaintiff was on 29 September 2000, and he found her condition unchanged from 28 July. Dr. Jarman had the results of a lumbar MRI scan, which revealed degenerative changes and some protrusion of the L5-S1 disc, but the disc material was not touching the nerve, nor were the nerves swollen. After analyzing the x-rays taken by Dr. Sanchez on 8 February 2000, Dr. Jarman was of the opinion that plaintiff had preexisting degenerative disc problems and that it is likely that this disc herniation was existing prior to her alleged injury on 5 February 2000, although the disc appeared to have been aggravated at some point. Dr. Jarman was also of the opinion that in light of the fact that plaintiff worked without incident for over a week after being released by Dr. Sanchez, the incident at home on 3 March 2000 was more likely the aggravating factor, rather than the alleged on-the-job injury of 5 February 2000.
34. Plaintiff's degenerative joint and disc disease of the lumbar spine preexisted her alleged injury at work on 5 February 2000, and that disease could be aggravated simply by activities of daily living.
35. Dr. Jarman did not recommend that plaintiff undergo any surgery on her back. He did not feel that surgery would be of any benefit, and he questioned whether fusion surgery was warranted. Additionally, Dr. Jarman attributed any possible need for surgery to the 3 March 2000 injury at home, rather than to the alleged workplace incident of 5 February 2000.
36. Plaintiff was evaluated by Dr. Damien Doute, Dr. Jarman's partner, on 18 October 2000. Dr. Doute noted that other than having some limitation of range of motion, plaintiff's physical examination was essentially normal. He did not detect any evidence of nerve root compression, sciatica, or radiculopathy. Dr. Doute diagnosed degenerative disc disease and prescribed an anti-inflammatory, but he did not provide any treatment for plaintiff. He did document in his notes that a spinal fusion to removed instability at L5-S1 caused by degenerative disc disease might be a treatment option, but that he would require additional testing before specifically recommending surgery.
37. Dr. Doute was of the opinion that it is unlikely that the alleged incident at work on 5 February 2000 caused plaintiff's back complaints for which Dr. Doute evaluated her in October 2000. Dr. Doute further testified that the injury suffered by plaintiff at home on 3 March 2000 could have caused the disk herniation at L5-S1 and could have exacerbated plaintiff's preexisting degenerative disc disease, and that it was the 3 March fall at home, not the alleged February incident at work, that probably contributed to her back condition.
38. Based upon the greater weight of the evidence, plaintiff suffered no injury or disability resulting from work-related causes on or after 5 February 2000. Plaintiff's back problems and disability are more likely related to being knocked down by her stepdaughter at home on 3 March 2000 and pre-existing conditions.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff did not sustain an injury by accident arising out of and in the course of her employment or a specific traumatic incident of the work assigned on or about 5 February 2000. N.C. Gen. Stat. § 97-2(6).
2. The back and leg conditions complained of by plaintiff from 3 March 2000 to the present, and for which she has received treatment from Drs. Thompson, Rives, Jarman, and Doute, were not caused by, significantly contributed to, or materially aggravated by the incident on 5 February 2000. Those conditions were caused by a combination of plaintiff's preexisting degenerative disc disease and the injury to her back suffered at home on 3 March 2000 when her stepdaughter knocked her to the floor.
3. Plaintiff has not sustained any disability, in whole or in part, as a proximate result of any injury on 5 February 2000. Therefore, plaintiff is not entitled to any compensation for disability. N.C. Gen. Stat. §§ 97-29; 97-30; 97-31.
4. Plaintiff is not entitled to any medical compensation, and defendants shall not be responsible for any of the medical treatment received by plaintiff, other than the treatment by Dr. Alex Sanchez between 8 February 2000 and 23 February 2000. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under the law, plaintiff's claim for workers' compensation benefits is DENIED.
2. Each side shall bear its own costs.
This the ___ day of July, 2002.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN